UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                Plaintiff,

      v.

QUINCEY FRYE,

                Defendant.
_____

REPORT & RECOMMENDATION

17-CR-6073G

## PRELIMINARY STATEMENT

By order of Hon. Frank P. Geraci, Jr., Chief United States District Judge, dated May 18, 2017, all pretrial matters in the above-captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B). (Docket # 2).

On May 2, 2017, the grand jury returned a single-count indictment against defendant Quincey Frye ("Frye") charging him with possession of a firearm and ammunition as a convicted felon, in violation of 18 U.S.C. §§ 922(g) and 924(a). (Docket # 1). Currently pending before the Court is Frye's motion to suppress evidence seized during a search of 270 Weyl Street on March 26, 2016. (Docket # 26).[1] For the reasons discussed below, I recommend that the district court deny Frye's motion.

---

[1] Frye's omnibus motions also sought, *inter alia*, an audibility hearing, disclosure of Rule 404, 608 and 609 evidence, *Jencks* material, preservation of rough notes, and leave to file additional motions. (Docket # 26). Each of the motions was decided by the undersigned or resolved by the parties in open court on December 19, 2017. (Docket # 30).

**FACTUAL BACKGROUND**

This Court conducted an evidentiary hearing on Frye's suppression motion. (Docket ## 31, 32, 37, 38). Three witnesses testified on behalf of the government; the defense called no witnesses. (Docket ## 37, 38).

**I.      Testimony of Douglas Rusinko**

Douglas Rusinko ("Rusinko") testified that he worked as a parole officer with the New York State Department of Corrections and Community Supervision ("DOCCS"), commonly known as New York State Parole.[2] (Tr. 7-9). Rusinko was assigned to supervise Frye after his release from prison and, in early 2016, participated in a fugitive investigation involving Frye. (Tr. 9-10).

Frye was released from prison in October 2015 and placed under Rusinko's parole supervision at that time. (Tr. 10). One of Frye's parole conditions permitted Rusinko to "visit [him] at [his] residence and . . . permit the search and inspection of [his] person, residence and property." (Tr. 18; Government's Exhibit ("G. Ex.") 3). Upon his release, Frye resided at a shelter; in November 2015, he relocated to 137 Warner Street. (Tr. 33-34, 39). Rusinko testified that DOCCS records were updated to reflect that Frye's permanent address was 137 Warner Street. (*Id.*).

On the morning of Friday, January 29, 2016, Frye called Rusinko and informed him that his Warner Street apartment did not have any heat and requested permission to stay at his girlfriend's residence at 270 Weyl Street "for the night and possibl[y] [the] weekend." (Tr. 35-36, 37-40). Rusinko agreed and updated DOCCS records to reflect that Frye's "parole

---

[2] The transcript of the hearing shall be referred to as "Tr. ___." (Docket # 37).

approved address" was 270 Weyl Street. (Tr. 11-12, 38, 40-41). The following day, January 30, 2016, at 2:20 a.m., DOCCS was notified that the battery on Frye's electronic monitoring bracelet was low. (Tr. 41). Several hours later, at approximately 7:00 a.m., two parole officers visited Frye at 270 Weyl Street and directed him to charge his bracelet. (Tr. 42-43). The following day, the same officers returned to that location and again directed him to charge his bracelet. (Tr. 43). On February 2, 2016, DOCCS was notified that Frye's bracelet had been tampered with, and the bracelet was subsequently located at the intersection of Orange and Grape Streets in Rochester. (Tr. 12, 43). A parole warrant authorizing Frye's arrest was issued on February 2, 2016. (Tr. 13-14; G. Ex. 2).

On February 3, 2016, Rusinko went to 270 Weyl Street and spoke with Frye's girlfriend Tiffany Granderson ("Granderson"), who was approximately twenty years old. (Tr. 23, 44). According to Rusinko, Granderson lived in the upstairs apartment at 270 Weyl, along with her child (whose father was Frye), her mother, and her mother's partner. (Tr. 11, 17, 23). Granderson informed Rusinko that she had last seen Frye the previous day and did not know why he had absconded. (Tr. 44). She permitted Rusinko to search the apartment for Frye. (*Id.*). Granderson's parents were present during the entry into and search of the apartment. (Tr. 45).

Rusinko returned to Weyl Street on February 13 and March 4, 2016. (Tr. 45-46). During both visits, Granderson and her parents were present, and she permitted him to search the apartment. (Tr. 45). During one of his visits to Weyl Street, Rusinko informed Granderson that he had a warrant for Frye's arrest, although he did not show her the warrant. (Tr. 26-28, 46).

At approximately 7:00 a.m. on March 26, 2016, Rusinko returned to 270 Weyl Street, accompanied by several other parole officers, including Senior Parole Officer Mack and

3

Officers Hrovat, Shearing, Torres, and DeMadera. (Tr. 15, 24, 47). To the best of Rusinko's recollection, none had their guns drawn as they approached the residence. (Tr. 17-18). Rusinko had no specific information that Frye was inside the apartment at that particular time, although it remained his last known address. (Tr. 28).

Rusinko testified that a door on the east side of 270 Weyl Street led into a common hallway between an upstairs and downstairs apartment. (Tr. 24). The hallway had a window that was above and slightly north of the exterior door. (*Id.*).

Rusinko knocked on the exterior door, and Granderson eventually looked out of the window to communicate with the officers. (Tr. 24, 47). Rusinko told Granderson that they were there to look for Frye; Granderson told him that Frye was not there. (Tr. 25). Rusinko stated that they needed to search the apartment, and Granderson replied that she was unable to give permission to search because her parents were not home. (Tr. 25, 47). Rusinko requested that she call her parents, but Granderson indicated that they did not have a phone. (Tr. 25-26, 47). Rusinko told Granderson that she was capable of providing consent because she was an adult. (Tr. 48, 52). Rusinko testified that he spoke to her in a conversational tone of voice, but that she yelled at him. (Tr. 29).

The exchange between Granderson and Rusinko lasted approximately five minutes, after which another officer began conversing with Granderson. (*Id.*). Eventually, Granderson came to the door, opened it, and turned to walk back towards her apartment. (Tr. 30, 47, 51). Rusinko approached the door and asked Granderson whether she was allowing the officers to enter and search the apartment. (Tr. 30, 50). Rusinko could not recall precisely Granderson's response, but indicated that he would not have entered the apartment unless she had given permission to do so. (Tr. 50-52).

4

The officers entered the apartment, found Frye hiding in the attic, and located a firearm in a different room. (Tr. 32). At no time during or after their entry did Granderson tell the officers that they could not enter the residence or that they needed to leave. (Tr. 31). According to Rusinko, neither he, nor any other officers, made any promises or threats to Granderson to induce her to give permission for the search, nor did they force their way into the apartment. (Tr. 30). According to Rusinko, Granderson did not appear to be ill or under the influence of drugs or alcohol. (Tr. 32-33).

## II.     Testimony of Christopher Mack

Christopher Mack ("Mack"), a senior parole officer employed by DOCCS, testified that he accompanied Rusinko and other parole officers to 270 Weyl Street on March 26, 2016, in an attempt to locate and arrest Frye. (Tr. 54, 56-57). Mack had not previously been to 270 Weyl Street or been involved in the investigation into Frye's whereabouts. (Tr. 69-70). Prior to their arrival, Rusinko informed Mack that he had visited the residence on earlier occasions and, other than on one such occasion, had been given permission to search it. (Tr. 70).

Mack testified that on March 26, 2016, one of the officers knocked on the exterior door, and a woman leaned out of a window from a landing between the first and second floors of the house. (Tr. 58-59, 71, 77-78). Mack heard officers converse with the woman, and he may have spoken to her. (Tr. 60, 71-72). At some point Parole Officer Hrovat ("Hrovat") began speaking to the woman. (Tr. 71).

Initially, the woman was not cooperative and indicated that she did not have permission to open the door. (Tr. 60, 73). After speaking to the officers for approximately five minutes, the woman left the window, and Mack believed that they would not be able to enter the

residence. (Tr. 62, 73-74). However, the woman unexpectedly opened the door and stood to the side. (Tr. 66). As officers began entering a common hallway, Mack approached her to obtain verbal permission to enter and search her apartment. (Tr. 63, 65-66). By the time he reached her, she was ascending the stairs. (Tr. 66, 75). While they were on the stairs, Mack asked her if they could enter and search, and she responded affirmatively. (Tr. 67, 76-77, 81). Mack recalled that there was an interior door at the top of the stairs leading into the woman's apartment, but could not remember whether it was open or closed before they entered. (Tr. 79-81).

According to Mack, the woman did not appear to be under the influence of alcohol or drugs and seemed "coherent and very in control of herself." (Tr. 67). At no time after the officers entered the apartment did she tell them to leave. (Tr. 68).

### III.   Testimony of Hrovat

Hrovat testified that she was a senior parole officer employed by DOCCS and participated in the investigation at 270 Weyl Street on March 26, 2016. (Tr. 84-85, 86, 94). When they arrived on scene, the officers established a perimeter around the building. (Tr. 86-88, 94-95). Hrovat testified that after one of the officers knocked on the exterior door to the building, a young woman came to a window, which was located above and to the right of the door, and asked what they wanted. (Tr. 86-87, 95-96). Initially, the woman was defensive and irritated and informed them that she was not able to give them permission to enter. (Tr. 87-88, 90, 92, 97).

Hrovat eventually began to speak to the woman and informed her that Frye had consented to a search of the apartment because it was his parole-approved residence and advised her that they wanted her permission to enter the house to confirm that Frye was not there.

6

(Tr. 88-90, 96-98). Hrovat conversed with the woman for approximately three or four minutes until the woman left the window. (Tr. 89). Hrovat thought that the woman would not return. (Tr. 90). However, when the officers knocked again, the woman came to the door. (Tr. 90, 98).

The officers continued to talk to the woman and to explain their need to look for Frye in the apartment. (Tr. 89-91, 99). After initially insisting that she did not have permission to let the officers enter, the woman opened the door and indicated verbally that the officers were permitted to enter and search. (Tr. 89-90, 99-101). Hrovat, who participated in that conversation, heard the woman give her permission but was unable to recall exactly what the woman said. (Tr. 101-06). At that point, the officers entered through the exterior door and walked up the stairway towards the apartment. (Tr. 103). Hrovat paused on the stairs to speak with the woman, while the other officers entered the apartment. (Tr. 91).

### IV.    Frye's Affidavit

In support of his suppression motion, Frye submitted an affidavit stating that he had an expectation of privacy in the premises located at 270 Weyl Street, Rochester, New York. (Docket # 26-1 at ¶¶ 4-5). According to Frye, he was an overnight guest in the upstairs apartment on March 26, 2016. (*Id.*). Frye stated that he did not give permission to any member of law enforcement to enter or search the apartment that day, nor did he hear anyone else give the officers permission to do so. (*Id.*).

## **DISCUSSION**

Frye seeks suppression of the tangible evidence seized from 270 Weyl Street on the grounds that the officers unlawfully entered the premises without a search warrant.[3] (Docket # 26 at 4-7). The government contends that the entry was lawful because it was reasonably related to the parole officers' duties, and, in any event, Granderson consented to their entry and search of the premises.[4] (Docket # 28 at 3-6).

I agree with the government that the officers lawfully entered 270 Weyl Street after obtaining Granderson's consent.[5] It is well-established that a warrantless search is

---

[3] At the conclusion of the hearing, the Court offered Frye the opportunity to submit a post-hearing submission, but Frye declined to do so. (Docket # 38).

[4] Frye's challenge is limited to the lawfulness of the entry. (Tr. 5-6, 108). Accordingly, the Court need not address the government's contentions that the firearm was discovered in plain view or during the course of a lawful security sweep. (Docket # 28 at 6-7).

[5] There is no doubt that Frye, as a parolee, enjoyed "severely diminished expectations of privacy by virtue of [his] status alone." *Samson v. California*, 547 U.S. at 843, 849 (2006) ("parolees have fewer expectations of privacy than probationers because parole is more akin to imprisonment than probation is to imprisonment"); *see also United States v. Knights*, 534 U.S. 112, 119-20 (2001) (probationer's reasonable expectation of privacy is less than that of an ordinary citizen); *United States v. Massey*, 461 F.3d 177, 179 (2d Cir. 2006) ("[a] parolee's reasonable expectations of privacy are less than those of ordinary citizens and are even less so where, as here, the parolee, as a condition of being released from prison, has expressly consented to having his residence searched by his parole officer"), *cert. denied*, 127 S. Ct. 988 (2007); *United States v. Grimes*, 225 F.3d 254, 258 (2d Cir. 2000) ("parole justifies some departure from traditional Fourth Amendment standards"). Further, while caselaw exists supporting the government's contention that an officer's entry into a third party's residence to search for a parolee does not violate the parolee's constitutional rights because he has no legitimate expectation of privacy in the residence – either as a result of his status as a parolee or because he has consented to a search as part of his parole conditions, *see United States v. Viserto*, 391 F. App'x 932, 934 (2d Cir.) (summary order) (defendant could not challenge entry "because, under the conditions of his parole, he had consented to the search of any premises that he used as a residence"), *cert. denied*, 562 U.S. 1116 (2010); *United States v. Pabon*, 603 F. Supp. 2d 406, 416 (N.D.N.Y. 2009) ("recognizing a parolee's privacy interest in the home of a third party 'would grant the [parolee] broader rights in the third party's home than he would have in his own home[;] . . . regardless of whether [defendant] was living in [the third party's] apartment, an overnight guest, or merely there temporarily, he did not have an expectation of privacy in [the third party's] apartment that society would recognize as legitimate'") (quoting *United States v. Snype*, 441 F.3d 119, 132 (2d Cir.), *cert. denied*, 549 U.S. 923 (2006)); *United States v. Santalucia*, 666 F. Supp. 2d 268, 272-73 (N.D.N.Y. 2009) (search and seizure of firearm from defendant's mother's house did not violate defendant's rights either because those rights were severely diminished by virtue of his status as a parolee or because he had consented to a search of his residence), the evidence in those cases included information to suggest that the parolee was present in the premises at the time of the search. *See United States v. Viserto*, 391 F. App'x at 934 (informant provided information that defendant had moved into wife's residence); *United States v. Pabon*, 603 F. Supp. 2d at 409 (confidential informant told officers that defendant was in apartment prior to their entry); *United States v. Santalucia*, 666 F. Supp. 2d at 269 (officers had information from informant that defendant had been staying there); *see generally United States v. Bohannon*, 824 F.3d 242, 255-57 (2d Cir. 2016) (discussing evidence sufficient to

permissible if based upon the valid consent of a person authorized to provide consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973); *United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1995), *cert. denied*, 516 U.S. 1050 (1996). The consent need only be voluntary, that is, obtained without coercion, even if it was given without knowledge of the right to refuse consent. *See Schneckloth v. Bustamonte*, 412 U.S. at 241-42; *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995).

Voluntariness is determined based upon the totality of the circumstances. *Schneckloth*, 412 U.S. at 227; *United States v. Hernandez*, 5 F.3d 628, 632 (2d Cir. 1993); *United States v. Kon Yu-Leung*, 910 F.2d 33, 41 (2d Cir. 1990). Among the relevant considerations are: age, education, background, physical and mental condition, the setting in which the consent is obtained, whether *Miranda* warnings have been administered, and whether the individual understands the right to refuse consent. *See Schneckloth*, 412 U.S. at 226; *United States v. Kon Yu-Leung*, 910 F.2d at 41.

"Consent must be a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993) (citations omitted), *cert. denied*, 511 U.S. 1130 (1994). The government bears the burden of establishing by a preponderance of the evidence that the consent was voluntary. *United States v. Isiofia*, 370 F.3d 226, 230 (2d Cir. 2004); *United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir.), *cert. denied*, 454 U.S. 830 (1981). "The ultimate question presented is whether the officer had a reasonable basis for believing that there has been

---

demonstrate objective reason to believe defendant was within premises), *cert. denied*, 137 S. Ct. 628 (2017). Considering Rusinko's testimony that the officers had no specific information to suggest that Frye would be in Granderson's apartment at the time of their entry (Tr. 28), the government would be unlikely to make a similar showing in this case. Whether, and the extent to which, such a showing is material to the issue of whether the search was reasonable because Frye was under parole supervision is unclear from the decisions. I need not resolve that question, however, in view of my conclusion that Granderson consented to the officers' entry into and search of the apartment.

9

consent to the search." *United States v. Isiofia*, 370 F.3d at 231 (internal quotations and citations omitted).

Considering the totality of the circumstances, I find that Granderson voluntarily consented to the officers' entry and search of her apartment. First, the record demonstrates that Granderson, despite her initial protestations to the contrary, had authority to consent to the officers' entry into and search of the apartment. Granderson was an adult, and she rented the apartment and lived there with her children and parents. (Tr. 11, 17, 23; Docket # 26 at ¶ 8, # 26-1 at ¶ 2). *See United States v. Snype*, 441 F.3d at 136 ("there is no question that [the third party], as the lessor and resident of the apartment at issue, had the access and authority necessary to consent to a search of the entire premises"); *United States v. Todd*, 2013 WL 499857, *7 (S.D.N.Y. 2013) ("there is no dispute that, as a resident of the . . . [a]partment, [defendant's girlfriend] had authority to consent to a search") (citing *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (holding that third party who possesses common authority over premises may consent to search of premises)); *United States v. Oakes*, 2012 WL 3128954, *6 (W.D.N.Y.) ("the government has met its burden in establishing that [the alleged victim], as a co-resident of the premises, had authority to give consent to the officers for the search of the premises"), *report and recommendation adopted*, 2012 WL 3128952 (W.D.N.Y. 2012).

Further, nothing in the record suggests that the officers' conduct intimidated or coerced Granderson into providing consent. Rather, the credible testimony of Rusinko, Mack and Hrovat establishes that Granderson voluntarily consented to their entry. Although the officers arrived relatively early in the morning and surrounded the premises, the record demonstrates that the officers knocked and announced their presence, conversed with Granderson and explained the purpose of their visit, did not yell at her, and did not enter her

apartment until after they had obtained her verbal consent.[6]  Additionally, the record demonstrates that no promises were made to induce Granderson's compliance, and nothing in the record suggests that she was unusually susceptible to having her will overborne.  To the contrary, the testimony demonstrates that Granderson, although initially defensive, was coherent throughout the interaction, apparently not under the influence of any substances, and eventually cooperative with the officers.  Under these circumstances, I find that Granderson's consent was voluntary and recommend that the district court deny Frye's motion to suppress tangible evidence seized from 270 Weyl Street on March 26, 2016.

## CONCLUSION

I recommend that the district court deny Frye's pending suppression motion. (Docket # 26).

*s/Marian W. Payson*  
MARIAN W. PAYSON  
United States Magistrate Judge

Dated: Rochester, New York  
March 22, 2018

---

[6] I credit Hrovat's testimony that the officers did not cross the threshold of the exterior door until they had obtained verbal consent from Granderson. (Tr. 102-03).  In any event, even if Hrovat's testimony were not credited, the credible testimony of Rusinko and Mack (Tr. 49-52, 66-67) establishes that Granderson opened the exterior door, stood aside to permit the officers' entry, and verbally assented to the search before the officers crossed the threshold into her apartment at the top of the stairs.  *See United States v. Guzman*, 2015 WL 774211, *9 (W.D.N.Y. 2015) (in response to request to enter the residence, defendant "replied, 'yeah,' and partially opened the screen door for the officers – thus expressing his consent to the entry both verbally and non-verbally").

11

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[7]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

                                                 *s/Marian W. Payson*
                                                 MARIAN W. PAYSON
                                                 United States Magistrate Judge

Dated: Rochester, New York
        March 22, 2018

---

[7] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).